STATE OF NORTH CAROLINA
RANDOLPH COUNTY

FILE NO. 26CV003014-750
IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

| | | |
|---|---|---|
| **CODY ZIMMERMAN,** **Plaintiff,** | ) | |
| **vs.** | ) | **COMPLAINT** |
| | ) | |
| **EQUIFAX INFORMATION SERVICES LLC,** | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

Plaintiff Cody Zimmerman ("Cody") makes the following allegations against Defendant Equifax Information Services LLC ("Equifax"):

## INTRODUCTION

This case is about false credit reporting. Equifax, a consumer reporting agency, mixed Cody's credit history and identifying information with that of Cody's brother. Despite multiple disputes, Equifax repeatedly published inaccurate information about Cody to potential creditors, disclosed Cody's credit information to third parties without his authorization or any other permissible purpose, and refused Cody access to his own report, all in violation of the Fair Credit Reporting Act (FCRA), 15 U.S.C §§ 1681, et seq.

Equifax caused Cody damages, including denial of credit, lost opportunity to receive credit, loss of a unique real estate purchase opportunity, emotional distress, stress, invasion of privacy, deterioration of sibling relationship, and interference with ordinary daily activities.

## JURISDICTION

1. This court has jurisdiction under 15 U.S.C. §1681p.

2. Venue is proper in this judicial district under N.C.G.S. § 1-80 because defendant is a foreign corporation, Plaintiff resides in this district, and his causes of action against Defendant arose in this district.

3. Plaintiff brings this case within two years of the FCRA violations in compliance with the statute of limitations at 15 U.S.C. § 1681p.

## PARTIES

### Plaintiff Cody Zimmerman

4. Plaintiff Cody Zimmerman is a natural person and a "consumer" as defined by the FCRA at 16 U.S.C. § 1681a(c): "an individual."

5. Cody resides in Randolph County, North Carolina.

### Defendant Equifax Information Services LLC

6. Defendant Equifax Information Services LLC ("Equifax") is a Georgia corporation with a principal place of business at 1550 Peachtree Street, NW, Atlanta, GA 30309, and a registered agent, Corporation Service Company at 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608.

7. Defendant Equifax is regularly engaged in the business of assembling, evaluating, and distributing information concerning consumers for the purpose of selling consumer reports, as defined by the FCRA at 15 U.S.C. § 1681a(d), to third parties.

8. As such, Defendant Equifax is a "consumer reporting agency" as defined by the FCRA at 15 U.S.C. § 1681a(f).

## **LAW**

9. The FCRA governs the conduct of consumer reporting agencies (“CRAs”) such as Equifax. When Congress enacted the FCRA, it found that the “banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.” 15 U.S.C. § 1681(a)(1).

10. Congress recognized that CRAs such as Equifax “have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.” 15 U.S.C. § 1681(a)(3). Therefore, Congress determined that there “is a need to insure *[sic]* that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer’s right to privacy.” 15 U.S.C. § 1681(a)(4).

11. In enacting the FCRA, Congress was not only concerned about the credibility of the banking system and the privacy of consumers. It also recognized a need to “prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report.” S. Rep. No. 91-517, 91st Cong., 1st Sess. 1 (1969).

12. More recently, according to the Consumer Financial Protection Bureau, "As the range and frequency of decisions that rely on credit reports have increased, so has the importance of assuring the accuracy of these reports."[1]

13. Thus, when a CRA prepares a report about a consumer for a third party to view, the law requires that it "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

14. Information on a consumer report is inaccurate when it is "'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse'" effect." Dalton v. Capital Associated Indus., 257 F.3d 409, 415 (4th Cir. 2001)(citation omitted).

15. Some consumer reports are inaccurate due to mixed files. A "mixed file" is "a Consumer Report in which some or all of the information pertains to Consumers other than the Consumer who the subject of the Consumer Report." In re: Equifax Credit Info. Servs., Inc., 61 Fed. Reg. 15,484 (Apr. 8, 1996) (Federal Trade Commission Consent Order).

16. Consumers can submit disputes to CRAs regarding the accuracy or completeness of any information in their credit files, including when the

---

[1] Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System, at 5 (December 2012).

presence of another person's information on a consumer's report indicates a possible "mixed file."

17. Upon receipt of the dispute, the FCRA requires that the CRA conduct a reasonable reinvestigation of any information that the consumer disputes to determine if the information is accurate. 15 U.S.C. § 1681i(a). A "reasonable reinvestigation" in this context means "a fair and proper reinvestigation under the circumstances." See Mullins v. Equifax Inf. Servs., LLC, 2007 WL 2471080 (E.D. Va. Aug 27, 2007) (approving jury instructions).

18. Upon receipt of a dispute, a CRA must notify the furnisher of the disputed information about the consumer's dispute. The CRA must provide the furnisher with all relevant information the CRA received from the consumer. In conducting the reinvestigation, the CRA must also review and consider all relevant information the consumer provides. The CRA must delete or modify information that it finds inaccurate or incomplete, or that it cannot verify. The CRA must complete this reinvestigation within 30 days, or within 45 days if the dispute is based on a free annual credit report. Finally, the CRA must send the consumer written results of the reinvestigation and a credit report that is based on the consumer's file revised to reflect the result of the reinvestigation. 15 U.S.C. § 1681i(a).

19. Any CRA may furnish a consumer report to a person which it has reason to believe intends to use the information in connection with a credit transaction or for employment purposes. 15 U.S.C.§ 1681b.

20. Consumers have a right to know the information contained in their credit files. Therefore, a CRA must, upon request, "clearly and accurately disclose to the consumer all information in the consumer's file at the time of the request…." 15 U.S.C. § 1681g(a).

21. A CRA must also make such a file disclosure for free, and within fifteen days of the consumer's request, once during any twelve month period. 15 U.S.C. § 1681j(a)(1)(A).

## FACTUAL ALLEGATIONS

22. Cody Zimmerman is a thirty-four (34) year old truck driver who also owns a small farm, which he is looking to expand.

23. Cody has a brother with the same surname. The brother's first name, like his, starts with the letter "C." The siblings share the same birth date. They also have similar Social Security Numbers (SSNs).

### Equifax Knows That Some Siblings Could Have Similar SSNs

24. Equifax is aware of the possibility that any siblings born, naturalized, or claimed as tax dependents prior to June 25, 2011 could have similar or sequential SSNs.

25. Before June 25, 2011, an applicant's place of residence and the date of their SSN application directly influenced the sequence of digits in the SSN that the Social Security Administration ultimately assigned to them.

26. Two recipients from the same area of the same state who received SSNs around the same time could have at least the first three (3) digits and as many as the first (5) digits of their SSNs in an identical sequence, and possibly the last four (4) digits similar or even fully sequential.

27. Thus, when parents applied for SSNs for two or more children simultaneously, the Social Security Administration might issue similar or sequential SSNs to siblings.

28. Parents might apply for more than one child's SSN at the same time in the instance of a multiple birth, during a family immigration process, or during the period following the adoption of the Tax Reform Act of 1986.[2]

29. As of June 25, 2011, the Social Security Administration began randomizing SSN issuance so that the first five (5) digits of the SSN no longer indicate a particular recipient's geographic location or date of application.

[2] The Tax Reform Act of 1986 established a requirement that taxpayers include an SSN for each dependent age 5 or older claimed on their federal income tax returns.

## Equifax's Inaccurate Reporting Costs Cody Credit

30. Cody and his brother were both born prior to 2011, and received their SSNs prior to 2011.

31. For as long as he can remember, basically his entire adult life, Equifax has mixed Cody's credit information with that of his brother.

32. Over the years, lenders have delayed or denied Cody's credit applications.

33. Denials have occurred because Equifax sent lenders reports that inaccurately combined Cody's credit history with his brother's.

34. Denials have also occurred because Equifax inaccurately told lenders it did not have any file for Cody.

## Equifax Provides Cody's Credit Information to Third Parties Without his Permission

35. Additionally, on various occasions, Equifax sent Cody's brother's creditors and potential creditors reports that included Cody's financial information, such as his mortgage and credit card accounts.

36. Cody had not authorized Equifax to provide his SSN or credit history to his brother or his brother's creditors and potential creditors.

37. Equifax's actions violated the privacy of Cody's personal identifiers and financial information.

38. All of this has caused friction between the brothers. Cody does not want his brother and his brother's lenders to see Cody's financial information, while his brother resents that Cody's information on the report causes an imbalanced debt-to-income ratio that has hampered the brother's ability to get credit.

**<u>Equifax has known about Cody's "Mixed File" for Years</u>**

39. For at least a decade, Equifax has known that it had a mixed file containing information about both Cody and his brother.

40. For at least a decade, Equifax has known that Cody and his brother have similar names and SSNs and the same birth date.

41. For at least a decade, Equifax has known that it should take care not to combine Cody's personal identifiers (such as his name, SSN, addresses, and phone numbers) and credit history with his brother's.

42. Initially, a member of Cody's extended family helped the two brothers dispute the issue with Equifax.

43. Since then, both Cody and his brother have called Equifax repeatedly to alert the CRA that it has merged the two men's credit histories.

44. Cody's brother has also disputed Equifax's credit reporting via a third-party company, Credit Karma, after viewing on the Credit Karma app an Equifax report that contained both his and Cody's credit history.

45. Cody's brother once even hired a credit repair company to get the brother's Equifax credit histories separated from each other, to no avail.

46. Because the brothers' disputes with Equifax were unsuccessful, Cody gave up, and relied on explaining the problem to lenders to see if they would work with him anyway.

47. For example, in early 2024, Cody tried to finance a vehicle. When the dealer requested Cody's Equifax report, Equifax responded by providing a report that included his brother's accounts along with his.

48. Cody then had to call each of his brother's creditors to prove to the dealer that the accounts were his brother's, not his, so that the dealer would discount them when assessing his credit application.

**Equifax Continues False Reporting to Cody's Lenders**

49. One of Cody's goals is to expand his real estate holdings. In 2025, he had the opportunity to purchase a one-of-a-kind property adjacent to his own home. The 25.6-acre wooded tract offered hunting opportunities for Cody and his fiancé to enjoy on land of their own. Additionally, Cody realized that the timber on the property was a significant income opportunity for him.

50. Cody needed two-hundred-fifty-six thousand dollars ($256,000.00) financing to buy the property.

51. Cody applied for a mortgage through his farm credit association. At that time, the credit association only used Equifax reports in making its lending decisions.

52. Upon information and belief, based on the statements of the lender, the credit association denied Cody's application because, when it requested Cody's report, Equifax told the lender that it had no file for him.

53. Cody was devastated. The lender told him he would need to call Equifax to get his report corrected.

54. Cody contacted Equifax and sent a written dispute with his identification documents.

55. Equifax responded on or about November 7, 2025, in a letter addressed to Cody's brother, but sent to Cody's own street address.

56. In the letter, Equifax stated that it could not read the identification documents, and he would have to re-send them.

## **Equifax Denies Cody Copies of His Own Report**

57. When Cody tried to get copies of his report from Equifax online to review it for inaccuracies, Equifax repeatedly refused to provide it.

58. Cody also at one point sent in a written request for his free annual credit report through the mail. Equifax did not respond to the request.

59. When Cody asked his brother to get a copy of the brother's report so that he could use it to launch a new dispute, Cody's brother found that he is unable to get a copy of his Equifax report any more, either.

60. Equifax's refusal to give Cody a copy of his report hampered his ability to dispute inaccuracies.

61. After learning the landowner had spoken to another potential buyer, Cody knew that time was of the essence in getting funding for the purchase.

62. Because Equifax would not provide him or his potential lender his report, Cody attempted to mitigate his damages by refinancing his existing home and land so that he could use his home equity to fund his purchase.

63. The lack of an Equifax report was, again, a problem. A family member in the real estate industry referred him to a colleague who thought they might be able to help Cody work around the lack of an Equifax report, but they were unsuccessful.

64. His family members observed that the failure of his efforts to get a mortgage or refinance greatly upset Cody.

65. Additionally, Cody has recently realized that it is time to replace his 22-year-old personal pickup truck, which he uses to haul a horse trailer and equipment to other parts of the country.

66. In summer 2026, he found a late-model, low mileage truck that fit his requirements on sale for approximately fifty-eight thousand dollars ($58,000.00). Since he does not have that kind of cash on hand, however, he would need to get financing to move forward with this purchase.

67. Given the recent mortgage credit denial due to Equifax's inaccurate representation of his credit history, he has been discouraged from applying for auto financing.

**Actual Damages**

68. Defendant Equifax's incorrect, false, and misleading credit reporting, caused Cody severe and extensive damage:

a. Denial of credit and loss of credit opportunity;

b. Discouragement from applying for credit;

c. Invasion of privacy that left Cody without any control over the accuracy of his personal information;

d. Strife that deteriorated his relationship with his brother;

e. Emotional distress; and

f. Expense of time and energy trying to fix a situation that was not his fault, and corresponding stress.

69. Cody's good credit reputation is very important to him. He makes an effort to pay his loans and bills in a timely manner to maintain a decent credit score and stay in his creditors' good graces.

70. His credit reports with the other two major credit bureaus show a satisfactory credit history, so he knows his Equifax report would also qualify him for credit if Equifax would actually send lenders a report about him.

71. Nevertheless, Cody's chosen lender denied his attempts to get mortgage financing. Upon information and belief, based on the statements of the lender, the denial occurred because, when the lender checked Cody's credit, Equifax inaccurately told the lender that Cody had no credit history.

72. Cody knows that buying this unique parcel that is adjacent to his own will likely be impossible for as long as Equifax continues to withhold his report from lenders or to represent his brother's credit history to lenders as his. In the meantime, he can only hope that the other prospective buyer loses interest.

73. Similarly, he has delayed buying a truck that he needs due to knowledge that auto finance companies will be unable to get an Equifax report for him, or will receive from Equifax a report that misrepresents his brother's credit history as his.

74. Defendant's conduct also caused multiple invasions of Cody's privacy. Upon information and belief, based on his brother's recollections, Equifax has sent credit reports with his information on them to his brother's creditors.

75. Additionally, in order to persuade Equifax that he and his brother were two different people, Cody has had to ask his brother to obtain Equifax reports and to make disputes to Equifax and otherwise participate in correcting Cody's Equifax credit history. Cody is extremely embarrassed by this. He keeps his finances private and did not want his brother or his brother's creditors to know his business.

76. The incredible inconvenience that Equifax engineered caused tension between the brothers. Each time that a creditor sees his brother's accounts on Cody's credit history, Cody has to have his brother meet with the creditor to explain which accounts belong to him, and vice versa. It has gotten to the point that Cody does not even want to ask his brother whether his brother has been able to get an Equifax report, or talk with him about the situation.

77. Cody has also worried about the impact on his ability to obtain credit if his brother takes out a large loan himself, which Equifax's report would reflect as Cody's. He also worries that, if his brother ever falls behind on any payment obligations, Equifax would represent those delinquencies as Cody's. His brother feels similarly uneasy.

78. In combination, all of these consequences of Equifax's conduct have culminated in ongoing emotional distress for Cody. He is embarrassed each time he has to explain the situation to a potential creditor, upset that he

is unable to expand his farm, and feels constantly aggravated that, even after years of attempts, Equifax is still treating him and his brother as if they are the same person.

79. Cody Zimmerman's damages were foreseeable to Defendant Equifax. From many years of past litigation over its wrongful verification and dissemination of inaccurate information, Defendant knows the devastating consequences that false credit reporting can have on consumers.

**Punitive Damages**

80. Upon information and belief, based on a review of public record lawsuit filings and federal and state enforcement actions, Defendant Equifax has a long history of wrongful credit reporting, and consumers have been disputing mixed files with Equifax for more than thirty years.

81. For decades, consumers, state attorneys general, and regulatory agencies have been suing Equifax for its refusals to ensure the maximum possible accuracy of its reports and for its refusals to conduct reasonable investigations of consumers' disputes.

82. Within the past few years, Equifax has faced at least four lawsuits just in North Carolina from siblings whose personal identifiers and

credit histories Equifax had mixed during the same time frame that it mixed Cody's and his brother's.[3]

83. In the other sibling lawsuits, like this one, the siblings each spent years contesting their "mixed files" with Equifax, to no avail, as Equifax continued to disseminate inaccurate reports to their lenders and to disseminate reports containing their information to their sibling's lenders without their permission.

84. Equifax's internal policies and procedures do not appear to place any value on its obligations under FCRA to report information about consumers accurately or to properly reinvestigate disputed information.

85. Equifax's policies and procedures evince willfulness, wantonness, and reckless disregard for the rights and interests of consumers, and led directly to the injuries to Cody described herein.

## CAUSES OF ACTION

### Count One
### Violations of the Fair Credit Reporting Act ("FCRA")
### 15 U.S.C. §§ 1681 et seq.

86. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

---

[3] Khalil McCollum vs. Equifax Information Services, LLC, et al. (E.D.N.C. No. 5:21-cv-476); Khala McCollum vs. Equifax Information Services, LLC, et al. (E.D.N.C. No. 5:22-cv-139); Sonya Spruill vs. Equifax Information Services, LLC (E.D.N.C. No. 5:22-cv-426); Sonja Spruill vs. Equifax Information Services, LLC, et al. (E.D.N.C. No. 5:23-cv-295).

87. Defendant Equifax has violated the FCRA at 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit file(s) it published and maintains concerning Plaintiff.

88. Defendant Equifax has violated the FCRA at 15 U.S.C. § 1681i by actions that include, but are not limited, to the following:

a. Refusing to correct or delete inaccurate information in the Plaintiff's credit files after receiving actual notice of such inaccuracies;

b. Refusing to conduct a proper reinvestigation of Plaintiff's disputes;

c. Failing to forward all relevant information to the companies who furnished information for its credit files on Plaintiff; and

d. Knowingly failing to maintain reasonable procedures for identifying and verifying disputed information in Plaintiff's credit file.

89. Defendant Equifax has violated the FCRA at 15 U.S.C. § 1681b by furnishing consumer reports to persons without reasonable grounds for believing that those persons intended to use them in a connection with a credit transaction or employment purpose involving Plaintiff.

90. Defendant Equifax has violated the FCRA at 15 U.S.C. § 1681g by failing to disclose clearly and accurately to Plaintiff all information in Plaintiff's credit file at the time of Plaintiff's requests for the same.

91. Defendant Equifax has violated the FCRA at 15 U.S.C. § 1681j(a)(1)(A) by failing to clearly and accurately disclose to Plaintiff all information in Plaintiff's credit file for free upon request once during any twelve-month period.

92. As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff has suffered, continues to suffer, and will suffer future damages as described hereinabove.

93. Defendant Equifax's conduct, action and inaction was willful, rendering it liable for actual, statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

94. In the alternative, Defendant Equifax was negligent, entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

95. The Plaintiff is also entitled to recover costs and attorney's fees from Defendant Equifax in an amount determined by the Court pursuant to 15 U.S.C. § 1681n, or, in the alternative, 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CODY ZIMMERMAN prays the Court to:

I. Award him actual, statutory, and punitive damages incurred in an

amount in excess of twenty-five thousand dollars ($25,000.00) to be determined at trial against the Defendant Equifax pursuant to the violations of 15 U.S.C. § 1681, et seq. alleged herein;

II. Award him the costs of litigation and reasonable attorney's fees from each Defendant pursuant to 15 U.S.C. § 1681n (or, in the alternative, 15 U.S.C. § 1681o);

III. Award him pre-judgment and post-judgment interest;

IV. Grant trial before a jury on all issues so triable; and

V. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this day, September 25, 2026, by:

**/s/ Suzanne Begnoche**
Suzanne Begnoche, Attorney at Law
N.C. State Bar # 35158
P.O. Box 2035
Chapel Hill, NC 27515
Telephone: (919) 960-6108
Facsimile: (919) 500-5289
suzanne.begnoche@begnochelaw.com